Good morning, everyone. We're here today for oral argument. We're going to begin with Appeal 24-2275, United States v. Steven Dorfman, and we'll begin, Mr. Swanson, with you. May it please the Court? Yes, Counsel. My name is Nathan Swanson, and I'm here today on behalf of Appellant Steven Dorfman. Appellant Dorfman was convicted of one count of conspiracy to commit wire and mail fraud, eight counts of wire fraud, and four counts of mail fraud following a jury trial. Dorfman raises four counts of alleged error on behalf of the District Court. Now, unless there are any specific questions, I was going to proceed somewhat out of order and take up the second point raised by Appellant, mainly because there is a difference of opinion as to what happened. Point two argued that the trial court erred with regards to the government's Exhibit 10, that government's Exhibit 10 had not been admitted, and therefore it never should have gone to the jury. If you look to the record, the actual transcript of what happened in court that day, it's clear that the Exhibit 10 was never admitted. It was never offered. There was no opportunity for the defense to object or consent to its admission, and the trial court never ruled that it was admitted. The case law is replete with the statement, there's no magic words for admission, but you still have to offer evidence. It's supposed to be brought up in open court, there has to be the opportunity to challenge it, and it has to be ruled admitted, and that didn't happen here. The minute order does say Exhibit 10 was admitted, but the minute order is not signed by the judge. It's supposed to be descriptive of what happened. Errors can leak in there. The exhibit list, that's filed at the end of the trial, after the trial is concluded, after the jury has returned their verdict. Again, it's descriptive. It says this is supposed to have been what happened, but it doesn't substitute for the admission of Exhibit 10. You have to look to the record. Was there a stipulation that Exhibit 10 was admitted? No. There was a stipulation that Exhibit 10 consisted of a business record, so that would have been a legitimate objection, but that doesn't mean that every objection had been waived. I thought the stipulation was that Exhibit 10 was admissible. I believe the stipulation was that it was a business record of Simple Health, Your Honor. And so what objection would Mr. Dorfman have posed with regard to admissibility had he challenged at that time? Well, and that's part of the problem is we don't know because it was never offered, but if you're asking me, it's— Well, I think it's a dispute about whether or not it was offered. I'm just asking you kind of assuming that it was expressly offered and assuming that Mr. Dorfman objected, given the stipulation, what would be the basis for his argument that it's not admissible? Beyond the simple relevance or prejudicial effect, there were also hearsay statements of non-parties contained within the recording. It was approximately—I want to say it was four hours, certainly several hours of recording, including not just Mr. Dorfman speaking, but other people in the audience asking questions, talking amongst themselves. But even beyond that— And your contention is that the stipulation doesn't cover those statements? Yes, Your Honor. My stipulation would be that it was kept as a business record of Simple Health for that purpose, but no other objection was waived by that stipulation. And to proceed, even if there hadn't been any objection to it, here's the other problem with the admission, the fact that it wasn't offered and wasn't accepted. The defense never has a chance to respond to it. They've never had a chance to put it into context, to cross-examine it, to refer to it, because it's not clear that it's been admitted. If they don't know that it's in evidence, they can't address it, they can't rebut it, whatever it might happen to be. Then it goes back to the jury. Now, again, the case law is replete. Evidence that hasn't been properly admitted shouldn't be submitted to the jury. And how the trial court handles that is they're supposed to determine, first, was the jury actually exposed to that evidence? If it's sent to them, did they see it? And then, because the rule on this is clear that you can't inquire into the jury's actual deliberations, the judge is supposed to examine the exhibit to see what prejudicial effect it might have had. There seems to have been no question between the parties or the trial court that the jury was exposed to it. How many total exhibits were there that went back to the jury? The record seems to indicate all of them were sent back to the jury, and there were several hundred. What they reviewed—obviously, that's a little bit more problematic. There was allegations made by the defense that they reviewed this exhibit in particular. But given the nature of this case, where there were several hundred exhibits that were admitted, they're all provided. I believe the record indicates that a laptop with all of them on it was provided to the jury. We don't know which ones they viewed, but certainly they got all of them. You're relying on this minute entry, but the district court also found that the courtroom deputy was in communication with the parties to discuss the joint exhibit list, which is consistent with how, I think, most trials proceed. Why wouldn't we defer to that factual finding? Well, you're saying the factual finding that the courtroom clerk was in conversation. So certainly there—I don't think there's any question about that. I think defense counsel conceded that every day at the end of trial they were having conversations with the courtroom clerk. But what was not in that factual finding was specifically that the courtroom clerk discussed with the parties exhibit 10. And this kind of gets us into the unknown problem here, which is if the—and the record doesn't indicate— the co-counsel's—I'm sorry, co-defendant's counsel says, okay, as to 5, 6, and 7, let's just agree not to object and move on. If they don't know that the court is—or that the court clerk is considering exhibit 10 admitted there, they don't have any grounds to stand up and object to it. They don't have any knowledge necessary to say off the record at the end of the day, wait, hold it. Exhibit 10, you're saying exhibit 10 is in. No, it wasn't. We don't know what conversations were had there. The defense counsel—I mean, this was kind of the argument that defense counsel made at the motion for new trial. How do you object that something wasn't offered and admitted if you don't know that it's being considered admitted? This might be different to your point about the factual finding. If there had been a factual finding that parties you discussed exhibit 10 and didn't raise that objection at the time, then certainly that would be something else. That would be something that would be granted some deference. But that finding wasn't theirs, that the practice of the court was to talk about evidentiary issues. You can't talk about an evidentiary issue you don't know exists yet. And that was when counsel for the co-defendant pointed out during the motion for new hearing—I'm sorry, hadn't reviewed it, didn't find out until later. If we could move you to the first set of arguments about the Thompson case. In Thompson, the statute issue there just used the term false. The wire fraud statute uses false or fraudulent. Couldn't that latter phrase, fraudulent, encompass half-truths or omissions? Oh, certainly. I think that was the point of Nader. That was a point of—that's well established. But I think equally well established is that those half-truths, those omissions, they have to be material. And the materiality part, that's what's missing from government's proposed Instruction No. 2. It simply says that a scheme to defraud doesn't just require false statements. It also can be accomplished by the order of the words or the circumstances in which they're said. But you notice that in government's proposed Instruction No. 2, the word material never appears. It's never stated in that instruction that this misleading, this misinterpretation, this misleading impression, whatever it happens to be, from the order of the words or the circumstances they're given, that must be a material. The problem with government's Instruction No. 2 is that it's essentially orthogonal or standing apart from the rest of the instructions that say a scheme to defraud has to involve material omissions, material misrepresentations, material fraudulent statements. And I think this is consistent with this court's finding in Weimer. It's not just you say something that gives a false impression to the victims of fraud. That false impression has to be material. That Instruction No. 2, if that's taken as an accurate statement of the law, then the result in Weimer is inappropriate because in Weimer he certainly did give a false impression to the quote-unquote victims there. It just wasn't a material false impression. I think the hurdle, though, that that argument faces is that we have to consider the jury instructions as a whole. And certainly there are a number of other instructions where the jury was told that the fraud or fraudulent pretense, representation of promises had to be material. So why doesn't that address the issue of materiality that you're raising now? And that's why I use the phrase orthogonal to describe Instruction No. 2. The other instructions, they fit together. They provide, you know, it can be a misrepresentation. It can be false, fraudulent by omission as long as it's material. Instruction No. 2 stands apart from those. The concern with Instruction No. 2 is that even in context with the instructions that the jury could read this and conclude the scheme to defraud could be accomplished either by material misrepresentations or by giving a misinterpretation of the circumstances or misrepresentation or some such like that just because we have a misimpression of what's happening. But wouldn't, to Judge Lee's point, wouldn't that directly conflict with other jury instructions? I mean the jury instructions said a scheme to defraud is a scheme that is tended to deceive, et cetera. It's said by means of a materially false or fraudulent pretense. And certainly I agree. But then they are also told that a scheme to defraud or that a scheme to defraud can be accomplished by the order of the words. And they don't say material there. In Woods, the case that the government relied on here, I think it's notable that there was also an instruction in Woods when the jury was told whatever misrepresentation there was, false statement, fraudulent misrepresentation, omission, anything of those, what we call the facts, they must be material. That instruction tied it all together for that jury. No matter which one you're finding. Is it omission? Is it commission, misrepresentation, misimpression? All of them have to be material. And there's not a corresponding instruction here to tie them all together. Do you want to reserve the remainder of your time? I will. Yes, please. Very good. Thank you, Mr. Swanson. Mr. Reed, we'll now move to you on behalf of the appellee. Judges, it may please the court, Peter Reed for the United States. I'll also start with that second issue regarding Exhibit Number 10. I'd like to make four points about Exhibit Number 10. Two going to why a reasonable person could have come to the same conclusion that the judge did here. And two going to the harmless error standard under Rule 52. Starting with the abuse of discretion. When you look at the trial transcript here, there are four reasons why a reasonable person could have come to the same conclusion as the district judge did here that the government was admitting government's Exhibit 10 and that that exhibit came into evidence. The first is that counsel for the government said, I intend to introduce 5, 6, 7, 9, 10, and 12. The second is defense counsel then responded, if these have already been stipulated to, let's move along. And I think that first part is important. If they've already been stipulated to, let's move along. The government had just said these are the six exhibits that have been stipulated to, the response is if these have been stipulated to, let's move along. And so defense counsel then says 5, 6, and 7. And I think this is where the hook for the defendant's argument, because certainly the first part of defense counsel's answer suggests all six. But he goes on and says 5, 6, and 7. And I think that what matters here is the body language and tone. The judge was in the courtroom. The reality is that the judge, the court deputy, the government's counsel, they all understood defense counsel to be saying there is no objection to the full set of exhibits. And this made perfect sense. They were all stipulated to. They all involved the same subject matter. They were all involving the sales training. And so, third, the government counsel responds, if there's no objection, we move these exhibits in. Again, these exhibits were understood to mean all six by both the court and by the government and the courtroom deputy. And fourth, the government indicated that it understood that all six had been moved in because as soon as he says these exhibits, he says, if those are in, I'll sit down. It's in the context of previously saying that he planned to introduce all six exhibits in this set into evidence. These four contextual clues are more than enough to support the standard of review on appeal, which is whether a reasonable person could agree with what the district judge did here. The second point I'd like to make is... Mr. Rieck, what do we make of the fact that no one referenced Exhibit 10 at all at any point during the trial? The government didn't raise it. The defense didn't raise it. It's just kind of this kind of zombie exhibit out there. Is that relevant to our analysis at all? Judge, I think it's very relevant to the harmlessness standard. An exhibit that's admitted but not played for the jury, not mentioned in closing arguments, not relied upon at all by the government is classic harmlessness, and I think that's the first point on harmlessness. This is a classic example of harmlessness because, as you say, the government's not relying on this. It's not mentioned in closing, and those are the kind of things that this court typically looks to when it's determining whether a purported error is harmless or not. Here, there's no reliance on this exhibit all the way through. I think there are additional reasons why this is classic harmlessness. If you look at Exhibit 10, it's a video of the defendant, Mr. Dorfman, giving the PowerPoint presentation that came in in Exhibit 6. The entirety of the presentation is in a different exhibit. It's just who's presenting it that is different in Exhibit 10, and I think that's part of the explanation for why Exhibit 10 didn't end up being played. The contents of that exhibit was already into evidence. If I may, a second point on harmlessness is what this video goes to, I think, if I'm reading the defendant's brief right, is intent to defraud, and the government introduced extensive evidence of intent to defraud. I'll briefly just highlight some of those, but that's what two weeks of this trial was about. So harmlessness is first going to be what impact could this exhibit have had, and I think it's a classic example of harmlessness because it wasn't even relied on by the government, but also, on the flip side, there was extensive evidence of intent to defraud. There were the blatant lies in the online ads, which falsely suggested that this company was selling ACA-compliant plans for major carriers. You can see those ads on page 7 of the appellant's brief. There's the sales scripts themselves, which contain those six fraudulent statements that Dorfman personally wrote in an attempt to defraud his customers. Third, there was the use of the two-script system, where they would use a different script when HII was present, when they were being monitored, because they didn't want third parties to recognize what they were doing. Fourth, there is the deceptive customer service and cancellation practices. One example I'll highlight, Exhibit 462. HII is highlighting five problems with what Simple Health was doing at this time. Five major problems. One of those was the need to accurately describe the product. One of those was the need to be clear that the product is not ACA-compliant, and Dorfman's response is, how about you shove 90% of that shit up HII's ass for me? There's just overwhelming evidence that Dorfman was trying to defraud these victims and of his intent to defraud. In this additional exhibit, to Judge Brennan's point, there's over 450 exhibits in evidence. One more drip in that ocean of intent to defraud evidence is just not making the difference here. I could go on on intent to defraud. The daily drop-off reports, the bad retention rates, the decision to lie to HII about whether they were recording calls because they didn't want HII to know that they were defrauding their customers, the decision to buy burner phones so that they could artificially inflate their BBB rating because their customers so hated the way they had been defrauded that their BBB rating was terrible, the way they decided to lie to state investigators about some of the same issues. It's all intent to defraud. Enormous amount of evidence of intent to defraud in this case. If I could go back actually to the first part, there are two reasons why there's no abuse of discretion here. The first is that context. I think there's a second point here that this appeal illustrates very well, and it's made by the Third Circuit case in small, which is the burden is on the parties to check what exhibits are in for this exact reason. Anyone who's been through trial knows that you're neurotic about making sure that everybody's on the same page. You check at the end of a witness. You check at the end of the day. You check at the end of the next day. You check at the end of every day of trial. You check at the end of the government's case over and over and over again, and those opportunities were presented here to talk with the courtroom deputy. What exhibits are in, and if at any one of those points, defense counsel had said, wait, what about exhibit 10? Any issue could have been remedied. It would have been easy to do so. Again, it was the Dorfman's own statement. There's really no possible grounds to suggest that this evidence was not admissible, and that's part of why it was stipulated to as a business record. Mr. Weed, I'd like to move you to the question of the jury instructions, and it's a question about the provenance of the jury instructions. It seems like the key instruction here had its genesis in United States v. Woods, which is the Ninth Circuit decision, 335 F 3993 from 2003. Now, we all know Thompson had its – was from this court, went to the Supreme Court, has come back. How does Woods become the basis for the instruction that gets into this trial? Right. So Woods was a telemarketing case, frankly. This is an instruction that was developed for these kind of telemarketing cases where you have a long script that is designed as a whole to be misleading and deceptive. There are a number of instances, and it's outlined in the brief, specific instances that build on each other for why this is deceptive. And so prior to trial, this telemarketing case is out there. It provides an instruction for this kind of case, and so that's why it gets pulled in here. I think the second part of your question is about Thompson, and Thompson, of course, comes later after Woods. It's really not – its use here isn't really connected to Thompson one way or the other, but I think Thompson really clarifies why this instruction is correct. 1014 is a very different statute than the fraud statutes, and if I understand Opposing Counsel correctly, he's not necessarily objecting to the content of this instruction, which I think is supported by the Seventh Circuit's cases, and really a lot of this language is 60, 70, 80 years old and across multiple circuits. He's really arguing about whether the word materiality should have been repeated in this instruction, and I think this Court's cases are clear that instructions are read as a whole. They aren't read separately, individually. They're not individual constructs. They're read as a whole. The jury is presumed to follow them, and here the jury had a materiality instruction. It's presumed to have followed that materiality instruction, and there's no reason to think that they didn't. Could I ask you a question specifically about the jury instruction? What does it mean when an arrangement of words or the circumstance in which they're used may create an appearance which is false or deceptive? That word appearance seems kind of like a strange word in this context, right? Right. So I'd say two things, I think, about this, maybe two examples of this that would be helpful that are specific to this case, and again, this language about an arrangement and appearance is very old language. I cite some of the case law in my brief. It's from the Third Circuit. It dates back, I think, to the 50s, 60s, 70s, but I'll give two examples. The first is before the customers get transferred to the sales representative, they've seen two different things. They've seen an advertisement, and that advertisement typically said, buy Blue Cross Blue Shield or apply at home, right? Or they saw an ad that said Obamacare enrollment, okay? In the background of those experiences, they were then directed to a website that says, get quotes from 15 top companies, okay? They then go to an HII or, excuse me, to a Simple Health sales rep who says, I'm here representing major carriers. The sales rep's statement is a different statement, right? But it has to be read in the context, the appearance of those earlier statements, and I think that's what we're getting at when we talk about the arrangement may create an appearance that is false or deceptive. The whole point of the ads and of the lead website was to create an appearance that they represented these companies so that when they reached the sales rep, they assumed that's who they were talking to, and they weren't talking to a rep from one of those companies. That was false. A second example, I think, is what's referred to as the doctor's visit exhibit in the script. And so the script uses this example where they say, suppose you have a doctor's bill that's $200. You get the contracted rate, and it marks down to $70, and you get $50 off. So you end up paying, in this example, $25 on $200, right? When you look at the exhibits, these were random numbers. There's actual exhibits of executives in this company saying, well, if we said zero on a $200 bill, that wouldn't be believable. So what's the lowest price we can give that's believable but also sells a lot? There was no contracted rate for $70. It was completely made up. But the argument from defense was that this example was technically true, right? Because, well, yes, if you got it, the math is the math, math, right? Yes, if it was a $200 bill, and yes, if it got marked down to $70, and yes, if you got a $50 payment, you'd pay $25. But there are assumptions baked into that. You're creating an appearance that you'd pay $25 on a $200 bill when that just wasn't the case. The numbers were made up. And so you make that statement with the intent that the listener thinks, oh, I'll pay $25 for a doctor's visit. Nonsense. The numbers were made up. The math might check out, but it didn't reflect reality. There are no further questions. No, thank you, Mr. Reed. Mr. Swanson, we'll now move back to you for rebuttal argument. Just very briefly. With regards to Exhibit 10, I have to argue somewhat with Mr. Verschman. The actual statement of defense counsel was, if we've already stipulated to Exhibits 5, 6, and 7, just now object to move on. He was very clear. If we've stipulated to those exhibits, 5, 6, and 7, not 9, 10, and 12. If he had meant to include those, he would have. He didn't. The other point I would make is that the government pointed out it's the burden of the parties to determine what exhibits have been admitted. That goes both ways here. The government's arguing that defense counsel should have stood up and said, wait, hold it. You didn't admit Exhibit 10. That burden falls equally on the government to say, wait, hold it. Did I admit Exhibit 10? They could have raised it, too, and it still would have been resolved. To say that defense counsel has to object that exhibits weren't admitted, but the proponent of the exhibit is the one who carries that burden. It's the government's burden at the trial. I'd also point out, as to the harmlessness analysis, Judge Lee, you pointed out this was never referenced again. Certainly, when the judge got to the prejudice portion of the analysis, that might have been relevant, but he also would have to review the content of the exhibit. When you look at the cases buried in, I'm probably butchering how this is pronounced, but I think it's Sububu, but I'm not entirely sure. Those cases I'll talk about first determined, was the jury exposed to it? Well, you could look at the record and conclude that if the government had argued it or they had played it. But when it's something that wasn't admitted and, therefore, should not have gone back, you have to actually check with the jury to see if it was. They seem to have assumed that, but it wasn't clearly in the record. And then going to the argument with regards to government's proposed number two, again, Judge Lee, I think that question about the appearance kind of gets to the heart of this. The examples that the government uses, if they give a misunderstanding to the consumer, you're going to get a $50 copay. You're going to get 30% off. Okay, fair enough. That is absolutely a material misrepresentation, and to the extent their scripts were doing that, that would be problematic. But they changed those scripts to say, up to. This is an example. Hypothetically, all of those things. Those give the impression that this is a good deal. This is a valuable product. And that may have been a mistaken impression. You or I might not want to purchase it. But that's puffery. Puffery is not sufficient for fraud. So when they say appearance, they're broadened substantially beyond material misrepresentations, materially inaccurate fraudulent statements, whatever it happens to be, to just misleading representations, misleading impressions. That is much, much broader than what the fraud statutes reach. All right, there are no other questions. Thank you, Mr. Swanson. Thank you, Your Honor. The case will be taken under advisement.